Could the clerk call the next case, please? 313-0834, Tyson Michael v. Garbrecht, McCallum John, Moynihan v. Intelligent Solutions, Inc. Richard Bugin, Michael Kosio, Reed Conard, I believe by Megan Preston. Thank you. As you're making your way up, let me say that Justice Litton is the third person on this panel. He's ill today and is not able to be here. He will be listening to the oral argument, participating fully in the discussion of the case, and in its resolution. So don't think that you're being shortchanged in any way. Thank you, Your Honor. You can proceed, Mr. Moynihan. May it please the Court, Counsel. Your Honor, this case has come up on the appeal of Defendant Mike Garbrecht, and he's also a cross-appointee moving under Business Corporation Act 12.56 and 12.60 to have an interim receiver appointed to protect the corporation and the minority shareholders. The first issue to address is the standard of review. And there's no question that the standard of the trial court's decision on whether or not the remedy of an interim receiver is appropriate is subject to an abuse of discretion. However, where the court ignores precedent or commits an error of law in determining whether or not a remedy is needed at all, that is an error of law that is not subject to an abuse of discretion. An error of law is always an abuse of discretion. Here, the court had presented to it the Witters v. Vick decision from 2002, and that's 335 LF 3D 435. And in that decision, the appellate court expressly addressed the appropriateness of the appointment of an interim receiver where there had been a misappropriation of assets and a misappropriation of corporate opportunities by fiduciaries. And in that case, because of the nature of the misappropriation of assets and corporate opportunities, the court held it affirmed the decision to appoint an interim receiver and it indicated that because of those misappropriations, had a receiver not been appointed, it would have been an abuse of discretion. For some unknown reason, the trial court elected not to cite, to analyze, or address the Wickers decision from 2002. And by doing so, it ignored precedent regarding the types of misappropriation of assets and or corporate opportunities that would require the appointment of an interim receiver. Because it ignored that Witters decision, the trial court looked at and said it was limited to looking at what was currently happening. Twice in its opinion, very brief explanation of why it reached the decision, it emphasizes what's currently happening. Well, the Witters case that is directly on point said no, you're not limited to what's currently happening. We look at all misappropriations to determine if a remedy of an interim receiver is necessary to replace the fiduciaries who are engaging in misconduct. Because the court ignored the 2002 Witters decision in favor of a 2003 Witters decision on a different issue, the court ignored precedent and committed an error of law. The 2003 Witters decision the court cites is a decision to affirm the appointment of a liquidating receiver in the same case, issued after the interim receiver had been in place. The court also considered two additional cases, or actually the court considered one, the Polakaitis v. Sheralidis case on 68-113-610. And then the Appellees point the court to the Lee v. Tulin case. However, in both of those cases which affirmed the denial of the appointment of an interim receiver, the courts emphasized that the denial, a significant factor of the denial in how the case had to be looked at was there was no misconduct alleged by the fiduciaries. In the Polakaitis case, the court stated it's the factor that analyzes the record before us contains no evidence of fraud, and that's at 614 of the Polakaitis case. In the Lee case, similarly, the court indicated there was absolutely no evidence of fraud or mismanagement, though the absence of the misconduct by the fiduciaries was the basis of the affirming the decision that there was no necessity to appoint an interim receiver. Those cases can't control and don't control where there is evidence of misappropriation of assets, misappropriation of corporate opportunities, and as well here, significant fraud engaged in by the fiduciaries in the name of the corporation. Is how well the corporation is doing a factor in making that decision? I actually believe under the analysis when there's a misappropriation of assets and corporate opportunities, no, particularly in this case where the issue is are they currently misappropriating? They continue to hold the assets that they misappropriated. They took over 82% of the company's assets and transferred them to another company they own, and they continue to hold that. I believe under the Witters analysis, no, you don't look at is it profitable today, you look at what are the misappropriations. But even if you are considering the profitability today, the issue is the court was presented with the evidence. The last tax return that we had showed a 1,230% decrease in the net income of the company. At the September 13th hearing, the defendants brought in evidence of revenues that had not been produced previously and was inconsistent with the financial statements they had provided. From that, the court concluded that, oh, the company's profitable. Well, no, profit is revenues less expenses. By presenting evidence of revenues, that the revenues increased, that does not show that the company was even profitable. The last information the court had was a 1,230% decrease in net income that was stated in the tax returns that we had. And there is no evidence that the company ever became profitable after that. Okay. And all of that seems fairly fact-intensive. Are there issues here that can be resolved solely as matters of law? Well, Your Honor, the issue is, you're correct, it's fact-intensive, but the facts aren't disputed. Those facts are all admitted. Well, there are no factual disputes? No, not on those issues, Your Honor, not remotely. Okay. And that's one of the things that's very surprising here when we decide not to follow the first widder's case. The facts admitted by the defendants here, both in terms of misappropriation of assets, misappropriation of corporate opportunities, and the fraud, are all admitted in their testimony. Okay. Misappropriation of assets, there's roughly $800,000 worth of the company. Over $600,000 of that is taken to another company if there's asthma. Undisputed. They testified about it. Yep, we did it. Okay. They take capers. Capers is a software product. They identify it as the flagship product. They take those sales, and after my client said, wait a second, you can't make the arguments in this case that you're making to dismiss Mr. Williams' claims because they're fraud on the court, they start taking those capers sales and transferring them to an entity they created, capers LLC, that lo and behold again, they hold. Not ISI. They take capers assets, capers intellectual property, and they transfer it. On the Centella case, when fiduciaries take corporate assets, corporate intellectual property, and use it for another company that they own, as a matter of law, that is a misappropriation of assets. It's a waste of assets. You can't do it. Additionally, in terms of the misappropriations, they had the cloud hosting. It was a business that they had started to pursue on behalf of ISI. ISI was going to do this. Again, late 2012, after my client raises the problem, they say, no, we're going to create a new entity. It's going to be called Intelligent Cloud Hosting, LLC. The two defendants, Mr. Fugate and Mr. Kozeel, and two more ISI employees, defendant Reed Connorth and another employee, Mr. Abinanti, are now the owners of that company. They continue using ISI's employees and assets to pursue that opportunity. Under the Levy v. Markle sales case and under the Grant v. Nims case that we cite, because they're using the corporation's assets and employees, by law, as a matter of law, those are misappropriation of corporate opportunities, and they are stopped from denying that they have misappropriated those opportunities. As you go through these issues, there are no disputed facts. This is just an application of undisputed facts to uncontested law. The issue is the court didn't do that. The court doesn't consider any of these factors because of the misimpression that she's stuck with limiting to just current. But even if you looked at current, even if she was right that she had to look at current, current when? In 2012, when Mr. Williams filed his lawsuit, he raised a 1256 claim. In 2012, after he did, the defendants took over $400,000, over half the value of ISI, and transferred it to their company ESMA. After my client raises, brings this motion that we're here on today, in January of 2013, they continue taking cloud hosting business, they continue taking the paper sales and transferring to their entities away from ISI. They start making payments of their personal lawyers out of ISI funds. If you're talking current, it's the day of the second hearing, not the first. First day of the hearing is February 1st of 2013. Very lengthy delay. Second day of the hearing is September 13th, 2013. If you wait all the way until then, they're continuing to take the papers business. They're continuing to take ISI sales. And one other item that they do is they're continuing to transfer money to their company ESMA and calling it rent. Now they never gave notice to the board or to the shareholders that they were going to be paying rent. They've never put in evidence that those rent payments were fair. And as we discussed in the brief, the case law in Illinois is if the fiduciary who engaged in self-dealing transactions does not present evidence that the transaction was fair, it is by law a misappropriation of asset or a misappropriation of opportunity. They didn't do that. So there is no question that under the law and uncontested facts,  to the tune of over 80% of the company's assets. They've taken the business that was its flagship. They've taken a new line of business that they went into and they've transferred them all to themselves. And then one of the things that is really the elephant in the room here is the fraud. They admit, and this is quite remarkable, they admit Mr. Fugate and Mr. Williams were the 50% shareholders each. They sold my client's stock to entice him to stay on because he was the architect of the flagship paper's product. And so they give him, he's able to purchase an interest in it. But Mr. Williams and Mr. Fugate are concerned because Mr. Williams' wife wants a divorce. And so what do they do? They're concerned she's going to come after the stock. They testify. We were concerned she was going to come after the stock. Mr. Williams admits he went and saw counsel. What do I do? My wife's going to come after my stock. And so what do they do? They come up with a plan. Mr. Fugate, Mr. Cozzio, and Mr. Williams. And they've admitted this in testimony and in the briefs filed with the trial court and in the brief filed with this court. They admit that they go and we issue more stock. We issue it to Mr. Fugate, even though it's going to go to Mr. Williams after the divorce. Their plan was transfer his stock to him after the divorce. That's fraud. They're defrauding Ms. Williams in her divorce so that she gets much less for the value. And the plan is, and this is, again, it's when they talk about the, you know, it's important looking at these are, again, their words. If you look in this, the response to the appeal, I believe it's at page 17. They talk about the plan was that they were going to be returning his stock after the divorce. They issue the stock in Fugate's name, and then they're going to return Williams' stock to him after the divorce, the stock that was issued to Fugate. And so this is all, and they, in doing so, they implicate ISI in fraud on Ms. Williams. They create fraudulent documents that they filed with the Secretary of State, and they implicate ISI in that fraud. You know, in this litigation, when they start to defend this motion, they make the assertion that after we point out the October 2009 consent could not issue the stock. It could not authorize stock because Mr. Garber refused to sign it because he believed it was an improper taking of stock to give to Mr. Fugate, Mr. Williams, and Mr. Garber himself at the expense of, or I'm sorry, Mr. Fugate, Mr. Cozio, and Mr. Garber himself at the expense of Williams. Mr. Garber, who was the director, said, I'm not signing it. In the litigation, when they're going to make the argument to defend against Mr. Williams' claim that Mr. Williams only owns 0.5% of ISI stock because they never executed the transaction after the divorce, they went to the lawyer and the lawyer said, oh, wait a second, you do that, you know, that's going to demonstrate a fraud. You can't do that at this time. The implication is do it later. So when Mr. Garber is defending, when they're saying you can't do this, there is no authorization of that additional stock. He owns more than 0.5%. Your defense is invalid. You have to withdraw your motion to dismiss. They come up and they say, we're going to have a November 2012 consent that's going to rectify that problem. And we're going to go back and we're going to recreate and say everything we did before was good. Mr. Garber refused. He's an honorable person. He said you can't do this. He didn't know that Mr. Williams was involved in the fraud. Mr. Fugate and Mr. Cozio did. And so he refused to do that. And when they explain why that's not a fraud, when they say, oh, no, the October 2009 consent is fine and we can enforce our motion to dismiss argument, when they come back and they actually end up saying later on that, no, that he's right, Mr. Garber's right, there's no longer a dispute, yet that the October 2009 consent was an invalid corporate transaction. In this court, in this motion, or in this brief, they're now asserting that the October 2009 consent is in dispute. Despite the fact that in January of 2013 they filed a brief saying it's not. Despite the fact that the February 1st hearing, Mr. Cozio admitted that his verification that they didn't know that the 2009 consent was invalid in November 2012. He admitted he lied. He admitted his verifications filed in the trial court to defeat this motion were misrepresentations. That was his time. Thank you. Thank you, Mr. Moynihan. You will have an additional five minutes for rebuttal. Ms. Preston, good afternoon. Good afternoon. May it please the court, my name is Megan Preston. I represent the defendant appellees of Mr. Puget, Connorth, and Cozio. My clients are shareholders and members of the board of directors for Intelligent Solutions. A little bit of background about this company, Intelligent Solutions. It was formed around 1990 by Mr. Puget and the original plaintiff in this action, Mr. Williams. It's an IT type of organization. In 2009, Mr. Garber was an employee of the company. In April of 2009, the other members of the board of directors voted to make him a shareholder and a member of the board of directors. This is kind of when we start to get some disagreements between the parties. In October of 2009, there is a consent signed by some of the members of the board of directors to reduce the shares of Mr. Williams to a percentage lower than what he owned previously. That's the consent that the parties here dispute about whether it's effective or not. Some parties believed it was signed, some parties believed it was not signed. The lawsuit by Mr. Williams was eventually filed in 2012 claiming that his shares were wrongfully taken away from him. Then these parties come in and file claims against one another. Addressing the standard for review here, I think it's actually just an abuse of discretion standard. I say that first because the issue presented before the court by the appellant is whether the trial court abused its discretion in declining to appoint a receiver. The standard referred to under the Business Corporation Act and the cases cited relative to the Business Corporations Act are that the application for the appointment of an interim receiver is left to the sound discretion of the trial court. I think all of the cases agree on that. There were lots of factual issues presented to the trial court during the multiple hearings that were held on this issue. The trial court waived the testimony. We all know it's up to the trial judge to waive the testimony and credibility of the witnesses because they are in the best position to do so as they have the witnesses testifying before them at the time. Some of the factual disputes that remained that were present during the hearing were, for example, the financial issue. Was the business profitable or was it not profitable? Mr. Colesial, who's the CFO, testified that what the numbers were showed an increase in income over the couple of years at the time the dispute arose in 2012-2013. The numbers in 2013 were actually higher than they were in 2012 or were on track to be higher. So there's obviously a disagreement between the parties as to whether funds were being transferred out such that the numbers were lower or whether the company was profitable. The CFO is testifying that it was profitable and that's obviously one of the things that the court relied upon in making its determination. So my point is that we have lots of factual disputes. I don't think there were any disputes about the law and that we're left with just an abusive discretion standard. The cases just so we're clear on what abusive discretion means, I think it means that there's only an abusive discretion if the case is found reasonable, and I don't think that's what we have here. I think the trial court's decision was well-reasoned and thought out. The standard for appointing an interim receiver under the Business Corporations Act is that it should be appointed or may be appointed to preserve the corporate assets and take action to carry out the business of the corporation pending a full trial. This is just a temporary measure. It's not meant to be the final way that the party's dispute is resolved. Because it's a temporary remedy, the courts recognize that it's a drastic remedy and while it is left to the discretion of the court, the standards by which the appointment of a receiver should be decided are stringent. That is the standard under both the Polokaitis case and the Witters case, the 2002 Witters case that was referred to by the first district case and Witters is a fifth district case. Now, whether to appoint a receiver is not a there's no bright line standard that the courts can point to to say, if this happens, you should appoint a receiver. If this happens, you should not appoint a receiver. Instead, if you review the cases that determine whether or not a receiver is necessary, any of the cases to determine whether a receiver is necessary, the courts weigh all of the facts presented by the parties and make the determination as to whether a receiver is appropriate or not. That's under the Witters, 2002 Witters case, it's mentioned in the 2003 Witters case, it's under the Polokaitis case, and all the other cases relied on by the parties. The Polokaitis case says that a court of equity should only appoint a receiver when conditions of dissension, dispute, fraud, or mismanagement exist that make it impossible for the business to continue or to preserve the assets. It further states that there must be a present danger to the interests of the company, consisting of a serious suspension of business and imminent danger of waste. I think that's why it was important to the trial court that the business was currently profitable and was carrying on its normal business activities, because the courts direct the trial courts to those types of factors when considering whether it is appropriate to appoint a receiver or not. I'm sorry. What's the point of all of the additional LLCs and other organizations? Sure. The first one is a property company, ESMA. I know what they're doing. Oh, I'm sorry. What's the point of having them? The point was to put certain liabilities of the company into separate hands to protect intelligence solutions. That was done on the advice of one of the original attorneys. Actually, it was a practice that was begun at the time that the company was only owned and managed by Mr. Williams and Mr. Puget. You're shifting the liabilities to other companies so that they don't show up on ISI? The liability in that if a lawsuit was filed, intelligence solutions would be protected. Instead, it would be those I'm sorry. Have I answered your question? Maybe not. Not completely. Okay. I guess that I have personally red flags and sirens that go off when companies start throwing off other companies where it's all the same people who are involved. Sure. It makes me want to look and see what's going on here. I mean, you're telling me that you're shifting liabilities into other companies and what the trial court is looking at is intelligence solutions itself. Is that correct? Correct. In terms of determining whether an interim receiver is needed? Correct. Basically, what ISI is doing is taking all the stuff that would suggest that an interim receiver might be a good idea and putting them in something else. I don't necessarily agree with that, and I say that because these companies were set up years and years before, or at least some of the companies were set up years before these other parties became involved in the company. ESMA was originally the company that was purchasing adjacent parcels of property. The business is run out of a condo complex, so ESMA was the company that was holding the real estate. ESMA collects the rents and then pays it over to ISI to Intelligence Solutions. Okay, and there was some sort of official arrangement for the payment of rent? Intelligence Solutions loaned money to ESMA to purchase the property. That loan is reflected in the books. ESMA collects rent and then pays it over to Intelligence Solutions. And was there a transfer of stock in order to keep Mr. Williams' wife from getting it? Not necessarily to keep Mrs. Williams from getting it. At the time that the divorce was going on, Mr. Williams came to Mr. Fugate with concerns over what would happen in a divorce. At that time, they agreed they would reduce Mr. Williams' interests in Intelligence Solutions to possibly put it back after the divorce was finalized. There was no discussion about trying to defraud Mrs. Williams or to infringe on her rights. And I disagree with the allegation that there is a scheme by Mr. Williams and Mr. Fugate to defraud Mrs. Williams. So what were they doing? They reduced his interests and then they decided to talk after his affairs were in order to see what they would do. In the meantime, Mr. Fugate consulted with his attorney who said it would be fraud if you gave him his shares back. Okay. Alright. Okay. Regardless, I think that we're left with a is an interim receiver necessary to protect the assets of the corporation given the current state of the parties? I disagree that things that happened years and years ago necessarily weigh into the court's determination because the idea is to protect the current state of the corporation pending the outcome of litigation. There was no evidence presented to the trial court that assets were going to be transferred to these other companies kept from Intelligent Solutions. My clients testified that the other companies were all owned by Intelligent Solutions. All of their monies were paid to Intelligent Solutions. So there was no present danger presented to the trial court that things were going to change or that my clients would take action in order to deprive Mr. Garbrecht of his rights pending the final outcome of the case. The trial court specifically found the corporation was carrying on its business. Its assets were being preserved. There was no evidence the assets were being held by any of the individuals, Mr. Fugate, Mr. Posey, or Mr. Connor. And the trial court determined that based on its review of the QuickBooks records presented to it, that the company was profitable. So based on those facts, the trial court determined it was unnecessary to have an interim receiver appointed. Okay, you've said several times things that were done years and years and years ago. What kind of years ago are we talking about here? ESMA began buying property ESMA was formed in 2006 and bought some of its properties within that time and when Mr. Garbrecht joined the company in 2009, and then it bought I believe two parcels after 2009. I think the last may have been bought in 2010. I'm not certain on that date. Yeah, I don't have the final date of the purchase. But they did buy property after Mr. Garbrecht was a shareholder, that is correct. Okay. And what about the Capers thing? Capers actually is not operating as its own company. Mr. Posey or Mr. Fugate testified that they purchased the name Capers LLC because it became available and they had clients who were writing checks to Capers instead of intelligent solutions. Capers LLC is not doing separate business. Checks are being paid to Capers and are deposited directly to the intelligent solutions account. Okay. Thank you very much. Thank you. Mr. Moynihan, your Bible. Thank you. The person running Capers, Mr. Posey will initially testify, I'm sorry, Mr. Fugate initially testified that Mr. Posey and Mr. Fugate created Capers specifically so they could own the valuable Capers name. And then he tried to, he said, the plan was we were going to transfer business. When they realized that that's an issue, they said, no, no, no. At his deposition, no, but there's no business going through Capers. No money, doesn't have a bank account. At the 913 hearing, he testified explicitly, no, we created Capers because we started entering contracts for Capers to sell ISI's software. And we needed a bank account for Capers so we could deposit the checks made out to Capers to our company, Capers. So when we talk about the assertion that there's no evidence that there's a threat of continuing harm, the Capers business, the flagship product, all of those sales, beginning in 2013, began getting diverted to Capers. They used to be booked as ISI contracts. Beginning in 2013, Mr. Fugate and Mr. Cozio started having all those contracts be in the name of Capers, their company, that they created for themselves, not Mr. Williams. They created Capers specifically so that they could start having a company to deposit checks that they were getting from ISI's former customers that are now Capers customers. Cloud hosting, same thing. As of the hearing, cloud hosting business that ISI had started pursuing, that Mr. Fugate and Mr. Cozio, because they control the company, they were able to divert that to their company Intelligent Cloud Hosting, LLC. You asked a great question about why these other companies. The focus kept being on ESMA because that existed before. One of the things that they don't talk about with ESMA, ESMA was Mr. Fugate and Mr. Williams when they each owned 50%. There's not a difference between ESMA and ISI before April of 2009 when they started the plan to eliminate or to reduce Mr. Williams so they can defraud his wife. At that point, they also transferred Mr. Williams' interest in ESMA to Mr. Cozio. Now you no longer have ESMA and ISI having the same ownership. At that point, any now dealings that they have are self-dealing transactions that they have to give notice of. They start paying rents. They don't pay rents to ESMA until after they transfer it so it becomes an entity of Mr. Fugate and Mr. Cozio. The Witters case expressly addressed, if you are paying rent as a self-dealing transaction and you don't give notice or you don't put in evidence that the rent is fair, that is a misappropriation of assets that requires the appointment of an interim receiver. That is in the Witters case that the court elected not to even consider. It is the only case on point because it's the only case that deals with misappropriation of assets. The argument that they're separating these companies is separate from liability. I'm sure Your Honors know it. If not, I cite the case law. Alter ego. You can't say we're ISI that all of these companies' benefits and all of its money comes to us even though we don't own it. As soon as you say that and you do that, that makes ISI an alter ego of them and subjects it to the liabilities of them. If they wanted to separate it, they'd have the ISI own the entities. Parent companies are not responsible for the debts of their  The whole argument of, oh geez, we needed to do this to separate. Also, the argument that they focus on is, oh, this is back with ESMA. Capers didn't exist when Mr. Williams and Mr. Fugate owned it. They created that afterwards. Mr. Posey and Mr. Fugate. International ICH, Intelligent Cloud Hosting, they created specifically in 2012 to take over this new line of business away from ISI. Again, not Mr. Williams. Thank you. Two additional quick things. One, when they talk about the council indicated the ISI is profitable. Please look at the testimony. Please look at the exhibits. As I indicated in my opening argument, Mr. Cozio came in and testified about revenues, not profitability. I point out in the brief, you can have revenues increase and profitability decrease. In fact, it's something ISI did with regularity because they're incurring expenses to pay themselves money to take that money away. Additionally, regarding the standard, we cite to the Cable America Rephase Electronics 396, Bill F. 3D, 15-24, 2009 case. Quote, a circuit court always abuses its discretion when it makes an error of law. When they ignore case law to ignore what is a misappropriation so that they don't even get to the analysis, and that's not a factor they consider, that is an abuse of discretion. It's not an abuse of discretion. It's an error of law. They can't do it, and the court did it repeatedly here. She ignored the misappropriation. If you allow them to say 1256 and 1260 in titles fiduciaries to take away all the assets of the company, as long as they stop once the 913 hearing starts, then there's no internal receiver. As long as they stop when they're caught, that can't be what 1256 relates to. It can't be. Otherwise, it reads it out of existence because nobody would be stupid enough to continue doing it. Yet here, they did. Capers business, intellectual cloud hosting business continued to pay rent, and the continuing to pay rent is something explicitly addressed by Witters, the appellate court that said that is a misappropriation of assets that requires the appointment of a receiver. Excuse me, what was the site the last site that you gave us? Cable America. The Pace Electronics. It's 396. That's okay. If it's in your brief, I can find it. Thank you. Thank you. We thank both of you for your arguments this afternoon. We'll take the matter under advisement, and we'll issue a written decision as quickly as possible. The court will now stand in brief recess for a panel change.